**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,                    Case No. 14-cr-116 (JNE/JJG)

        Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Anthony Morrison,

        Defendant.

---

JEANNE J. GRAHAM, United States Magistrate Judge

This matter is before the undersigned United States Magistrate Judge on Defendant Anthony Morrison's Motion to Suppress Confessions, Admissions, or Statements Made in the Nature of Confessions (ECF No. 22) and Motion to Suppress Evidence Obtained through Illegal Search (ECF No. 23).[1] The Court held an evidentiary hearing on June 10, 2014. David P. Steinkamp appeared on behalf of the United States of America, and Craig E. Cascarano appeared on behalf of Defendant Anthony Morrison ("Defendant"). The briefing on the dispositive motions was complete on June 25, 2014.

### I.    Background

Defendant was indicted on April 22, 2014, for (1) one count of conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 846; and (2) one count of aiding and abetting possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). At the June 10 hearing, the Government called two witnesses: Officer Patricia Grant of the Minneapolis Police Department, and Sergeant Thomas

---

[1]      The parties' nondispositive motions were addressed in a separate Order (ECF No. 30).

Stiller, also of the Minneapolis Police Department and who had been assigned to the United

States Drug Enforcement Administration (DEA) Task Force. The Government also offered into

evidence for the limited purpose of the suppression hearing Government Exhibit 1—a compact

disc with audio recording of Defendant's interview with Officer Todd Babekuhl.

### A.      Officer Grant's Testimony

Officer Patricia Grant has been a Minneapolis police officer for over 23 years. At the

time relevant to this matter, in late 2012, she was working on the Community Response Team

(CRT), which focuses on search warrants, narcotics investigations, and directed patrols in areas

with a high level of narcotics activity. During her time with CRT, she worked on hundreds of

"street level" transactions involving hand-to-hand transactions.

On the morning of October 1, 2012, Officer Grant was in North Minneapolis and

responded to a citizen call complaining of drug activity. In response to the call, Officer Grant

eventually arrested a person who had a small amount of heroin in his possession. Officer Grant

indicated that if the confidential informant (CI) provided "good" information, it would be

beneficial for him. The CI responded that he could give Officer Grant information and he was

transported to the Fourth Precinct.

When at the Fourth Precinct, Officer Grant interviewed the CI. The CI stated that an

African-American male known as "Face" was selling a large quantity of heroin in the area of

Portland Avenue and Seventh Street in downtown Minneapolis. The CI described "Face" as

approximately five feet, ten inches in height, with dreadlocked hair, and a burned and scarred

face. The CI also disclosed that "Face" would be in a white Toyota 4Runner.

After receiving this information, Officer Grant, a fellow officer, and the CI traveled in

plainclothes and an unmarked vehicle to the area described by the CI. When a white Toyota

2

4Runner was not at Portland Avenue and Seventh Street, they travelled approximately one or two blocks and saw the vehicle. As they drove by the 4Runner, Officer Grant observed an African-American man with dreadlocked hair and a burned, scarred face seated in the front passenger seat. During her testimony, Officer Grant identified Defendant as the man she saw in the passenger seat. Officer Grant did not remember if the passenger window was up or down, nor did she recall if it was tinted.

Officer Grant then set up surveillance, using binoculars, approximately one block away from the 4Runner. She observed a person approach the passenger side of the 4Runner, engage in what she described as a hand-to-hand transaction, and leave. Officer Grant did not see any exchange of money or narcotics.

Following observation of this alleged exchange, Officer Grant called in uniformed officers to respond. Defendant was removed from the 4Runner and the 4Runner was searched. A diaper bag located on the floor of the passenger side of the vehicle contained approximately 160 grams of heroin, and 64 grams of heroin were found on Defendant's person. Defendant was carrying $1,865.00 in cash. The 4Runner also contained a hammer, baggies, and a scale, which were seized as part of the search of the vehicle. Defendant was arrested and taken to the Fourth Precinct CRT Office.

### B.      Sergeant Stiller's Testimony

Sergeant Thomas Stiller of the Minneapolis Police Department also testified. He has served with the Minneapolis Police Department for twenty years. During the time period relevant to this case, he was assigned as a Task Force Officer with the DEA.

On October 1, 2012, Sergeant Stiller was informed that the Minneapolis Police Department had seized a large amount of narcotics. When Defendant arrived at the Fourth

Precinct, Officer Todd Babekuhl attempted to conduct an interview with Defendant after reading

Defendant his *Miranda*[2] warnings, but Defendant declined to provide a statement. After being

informed that Defendant did not wish to speak, Officer Babekuhl terminated the interview. The

interview was recorded and the audio was provided to the Court. When Sergeant Stiller arrived

to the Fourth Precinct, Officer Babekuhl relayed information about his interview with Defendant

to Sergeant Stiller.

Sergeant Stiller and another law enforcement official then entered the interview room

where Defendant was located, seeking to obtain a statement from Defendant.[3] Sergeant Stiller

estimated that one or two hours had passed between when Officer Babekuhl read Defendant the

*Miranda* warnings and when Sergeant Stiller met with Defendant. Sergeant Stiller identified

himself and showed Defendant his credentials, at which point Defendant started speaking,

discussing the incident, the arrest, and the circumstances surrounding these events. Sergeant

Stiller interrupted Defendant and read him his *Miranda* warnings. Following the *Miranda*

advisory, Defendant agreed to talk. Sergeant Stiller and his fellow law enforcement officer asked

questions and Defendant provided information. At no time during the interview did Defendant

request an attorney, nor did he invoke his right to remain silent or express a desire to not speak.

Sergeant Stiller did not promise leniency or similar treatment, nor did Sergeant Stiller threaten

Defendant. Eventually, Sergeant Stiller terminated the interview.[4]

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] There is no audio of these events because the DEA does not record its interviews.

[4] Apparently, Sergeant Stiller included in his report that Defendant had requested an attorney when Officer Babekuhl met with Defendant. Sergeant Stiller testified that this inclusion was an error. The Court has reviewed that taped discussion and agrees that Defendant did not request an attorney at that time.

II.      **Motion to Suppress Evidence Obtained Through Illegal Search**

Regarding the arrest and warrantless search, Defendant argues the arrest was without probable cause because law enforcement failed to sufficiently corroborate the information provided by the CI. Defendant argues the information provided by the CI was general in nature, emphasizing that Officer Grant admitted that the alleged hand-to-hand transaction could have been innocent. The Government responds that probable cause existed to search the 4Runner under the motor vehicle exception to the warrant requirement and that probable cause existed to arrest Defendant.

A.      **Motor Vehicle Exception**

Warrantless searches, meaning searches conducted "without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). Under the motor vehicle exception, the police may "search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011). Probable cause exists "'where there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Information from an informant may also be considered in the probable cause analysis. "A key issue in determining whether information provided by an informant is sufficient to establish probable cause is whether that information is reliable. An informant may establish the reliability of his information by establishing a track record of providing accurate information." *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995) (citing *Gates*, 462 U.S. at 233). If the

informant is previously unknown to law enforcement, "the informant's lack of a track record requires some independent verification to establish the reliability of the information." *Brown*, 49 F.3d at 1349 (citation and internal quotation marks omitted). "Independent verification occurs when the information (or aspects of it) is corroborated by the independent observations of police officers." *Id.* An informant's tip, in conjunction with a controlled buy or other indication of illegal activity, may provide a "substantial basis" for finding probable cause. *See United States v. Oropesa*, 316 F.3d 762, 768-69 (8th Cir. 2003) (probable cause found where informant revealed that defendant had sold him drugs and police taped conversations of informant attempting to arrange a drug buy from the defendant).

Here, there is no indication that the CI has a track record of providing information to law enforcement, and thus there is no indication that the CI has a track record of providing *accurate* information. Upon receiving information from the CI, however, the officers were able to corroborate certain aspects of the CI's information. First, the officers established that a white Toyota 4Runner was parked in downtown Minneapolis near the area of Seventh Street and Portland Avenue. Although the vehicle was not precisely where the CI indicated it would be, Officer Grant's testimony established that the vehicle was in close proximity to that intersection. The accurate identity of the vehicle and its location weigh against suppression. Upon locating the 4Runner, the officers drove by and observed an African-American male with dreadlocks and a scarred face in the passenger seat. Although the Court acknowledges that any scarring on Defendant's face was likely difficult to see when driving by, or even with the use of binoculars, the other descriptors weigh in favor of accurate identification.

Finally, after the officers set up surveillance, they observed an individual approach the passenger side of the vehicle, a brief hand movement take place, and the individual depart.

Officer Grant testified that, based on her experience, she believed a hand-to-hand transaction occurred, as is common with the sale of drugs. This observation, too, weighs against suppression. Although the officers did not view any contraband, money, or drugs actually exchange hands, Officer Grant's belief was informed by her years of law enforcement service, including her work on "hundreds" of street-level transactions involving hand-to-hand exchanges. Moreover, the Court is mindful that probable cause does not require an actual showing of criminal activity. *See United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) ("[P]robable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity."). Accordingly, upon review of the totality of the circumstances, the Court determines there was probable cause to search the 4Runner based on the motor vehicle exception to the warrant requirement.

**B.    Warrantless Arrest**

The Government also argues that probable cause existed to arrest Defendant after heroin was found in the vehicle.

"An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe the defendant has committed or is committing an offense." *United States v. Torres-Lona*, 491 F.3d 750, 755-56 (8th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "The determination of whether probable cause exists must not rest on isolated facts rather it depends on the cumulative effects of the facts in the totality of circumstances.'" *Tokar v. Bowersox*, 198 F.3d 1039, 1046-47 (8th Cir. 1999) (quoting *United States v. Everroad*, 704 F.2d 403, 406 (8th Cir. 1983)). While a bare suspicion of criminal activity is insufficient to establish probable cause, the police need not have enough evidence to justify conviction before making a warrantless arrest. *United States v. Morales*, 923 F.2d 621,

624 (8th Cir. 1991).

The Court agrees with the Government. For the same reasons discussed above, and particularly in light of the narcotics found in the passenger side of the 4Runner, the Court finds that Defendant's arrest was with probable cause. As such, the Court recommends that Defendant's Motion to Suppress Evidence Obtained through Illegal Search be denied in its entirety.

### III.     Motion to Suppress Confessions, Admissions, or Statements

Defendant also moves to suppress statements made to law enforcement during the interview with Sergeant Stiller. Defendant argues that Sergeant Stiller attempting to talk to Defendant a second time, after Defendant had already indicated his unwillingness to speak with law enforcement, violated Defendant's Fifth Amendment right against self-incrimination.

When a defendant invokes his right to remain silent, officers must scrupulously honor that right. *Michigan v. Mosley*, 423 U.S. 96, 102-04 (1975) (holding that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored' " and noting "[no] passage in the *Miranda* opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent."). In *Mosley*, the United States Supreme Court relied upon the following three factors in deciding whether the investigating officers scrupulously honored the defendant's right to silence when they renewed his interrogation after the defendant had first declined to be questioned: "(1) whether the police immediately ceased the interrogation upon the defendant's request; (2) whether they resumed questioning only after the passage of a significant period of time and provided a fresh set of *Miranda* warnings; and

8

(3) whether they restricted the later interrogation to a crime that had not been the subject of the first interrogation." *Brown v. Caspari*, 186 F.3d 1011, 1014 (8th Cir. 1999) (quoting *Hatley v. Lockhart*, 990 F.2d 1070, 1073-74 (8th Cir. 1993)).

The Government contends that the present matter presents facts akin to those in *United States v. Thompson*, 866 F.2d 268 (8th Cir. 1989). In *Thompson*, the suspect initially told interrogating agents that he would "sleep on it" and would talk "tomorrow," but later volunteered that he wanted to "wait a little while before I'm interviewed." *Id.* at 270. Thompson then signed a waiver of rights form and answered questions. *Id*. The Eighth Circuit held that even assuming Thompson's initial statement was a request to defer questioning until "tomorrow," his initial decision to remain silent was reversed by his later volunteered statements. *Id.* at 271. Therefore, Thompson had not "effectively asserted" his right to remain silent, and *Mosley* did not apply. *Id.* at 271-72 ("We cannot find that the statements taken as a whole indicate a decision to invoke the right to remain silent. Accordingly, there is no need to address the 'scrupulously honored' test of *Michigan v. Mosley*.").

The instant matter contains one key difference from *Thompson*: here, it is undisputed that Defendant had exercised his right to remain silent and provided no indication that he wanted to merely delay his conversation with law enforcement. (Gov. Mem. at 9, ECF No. 32, June 25, 2014 ("Neither party disputes that [Defendant] exercised his right to remain silent when he was attempted to be interviewed by Officer Babekuhl.")). As such, the Court will continue with the *Mosley* analysis.

The first *Mosley* factor, whether the police immediately ceased the interrogation upon the defendant's request, weighs in favor of a finding that law enforcement scrupulously honored Defendant's rights. Officer Babekuhl stopped the interview immediately when Defendant

informed him that he did not wish to speak.

Under the second *Mosley* factor, the Court must determine whether the officers resumed questioning after the passage of a significant period of time and after providing a fresh set of *Miranda* warnings. In the instant case, there was approximately an hour-long interval between the two interviews. In *Mosley*, the Supreme Court held that an interval of more than two hours constituted "the passage of a significant period of time." 423 U.S. at 106; *see also Hatley*, 990 F.2d at 1074 (two-hour interval was "significant period of time"); *United States v. Ewing*, Crim. No. 09-103 (DSD/SRN), 2009 WL 2337121, at *8 (D. Minn. July 29, 2009) (one hour is sufficient where authorities did not wear down suspect's resistance), *aff'd in part*, 632 F.3d 412 (8th Cir. 2011); *see also United States v. Boyd*, 180 F.3d 967, 977 (8th Cir. 1999) (statements made following a one and one-half or two-hour delay were covered by previous *Miranda* warnings). Moreover, while the Eighth Circuit has ruled that it "of course cannot predict what length of time the Court will establish as the minimum interval necessary to satisfy the second *Mosley* factor," *Hatley*, 990 F.2d at 1074, this Court is satisfied that the one-hour period between interviews was sufficient, particularly because the Court is not presented with evidence that the authorities "persisted in 'repeated efforts to wear down [Defendant's] resistance' in order to change [Defendant's] version of the facts." *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1993) (quoting *Mosley*, 423 U.S. at 105-06).

Similarly, in light of the one-hour interval and lack of any showing that law enforcement engaged in improper tactics to wear down Defendant's resistance, the Court finds that law enforcement was respectful of Defendant's rights in this case. This respectfulness also extended to reading Defendant a second set of *Miranda* warnings. As Sergeant Stiller recounted, when he entered the room in which Defendant was located and introduced himself, Defendant began

10

speaking. Sergeant Stiller then interrupted Defendant to read the *Miranda* warnings. Although the second factor is a closer call, upon full review of the events, the Court determines that the second factor favors the Government.

Finally, the third *Mosley* factor analyzes whether the later interrogation was restricted to a crime that had not been the subject of the first interrogation. Although Defendant did not provide a statement to Officer Babekuhl, it is apparent that the content of the interview would have involved his recent arrest and the events surrounding that arrest. His arrest and circumstances of the arrest were also the subject of the interview with Sergeant Stiller. However, even assuming this was sufficient to satisfy the "subject of the first interrogation" factor, this factor alone is insufficient to find that Defendant's rights were violated under *Mosley*. *See Caspari*, 186 F.3d at 1015 (noting that "this court has repeatedly held that 'a second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview'") (quoting *United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991)).

Upon balance of the factors, the Court is unconvinced that suppression is appropriate here. The first *Mosley* factor clearly favors the Government's position, as does the second, narrowly. The third factor favors suppression, but is not dispositive on this issue. In considering the sum of the events surrounding the second interview, the Court recommends that Defendant's Motion to Suppress Confessions, Admissions, or Statements be denied.

Based on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Defendant Anthony Morrison's Motion to Suppress Confessions, Admissions, or Statements Made in the Nature of Confessions (ECF No. 22) be **DENIED**.

11

2.      Defendant Anthony Morrison's Motion to Suppress Evidence Obtained through

Illegal Search (ECF No. 23) be **DENIED**.


Dated: July 8, 2014.                           *s/Jeanne J. Graham*

                                               _____
                                               JEANNE J. GRAHAM
                                               United States Magistrate Judge


### NOTICE

        Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **July 22, 2014** A party may respond to the objections within ten days after service thereof.  Any objections or responses shall not exceed 3,500 words.  The district judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made.  The party making the objections must timely order and file the transcript of the hearing unless the parties stipulate that the district judge is not required to review a transcript or if the district judge directs otherwise.